UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
—————————————————————————

JOHN MONTALBANO,
                    Plaintiff,

          - against -                          10 Civ. 5973 (JGK)

                                               OPINION AND ORDER
THE PORT AUTHORITY OF NEW YORK AND
NEW JERSEY, ET AL.,
                    Defendants.
—————————————————————————

JOHN G. KOELTL, District Judge:

     This case arises out of the plaintiff John Montalbano's
("Montalbano") desire for a gun permit.  The plaintiff, a former
officer with the Port Authority Police Department ("PAPD"),
brought this action against the Port Authority and two
psychologists employed by the Port Authority, Dr. Doris Francis
and Dr. Francine Silver, alleging violations of his
constitutional rights under the Second and Fourteenth
Amendments, as well as violations of 42 U.S.C. § 1983.  The
plaintiff also brought state common law negligence claims
against the Port Authority and Drs. Francis and Silver, and
state common law defamation claims against two other PAPD
employees, Inspector Michael Guarnieri and Sergeant Kenneth
Kohlmann.  Before the Court are the parties' cross-motions for
summary judgment.  Jurisdiction is proper pursuant to 28 U.S.C.
§ 1332 and § 1367.

## I.

The standard for granting summary judgment is well established.  "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1223 (2d Cir. 1994).  "[T]he trial court's task at the summary judgment  motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them.  Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." Gallo, 22 F.3d at 1224.  The moving party bears the initial burden of informing the district court of the basis for its motion and identifying the matter that it believes demonstrates the absence of a genuine issue of material fact.  Celotex, 477 U.S. at 323. The substantive law governing the case will identify those facts that are material and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

Summary judgment is appropriate if it appears that the nonmoving party cannot prove an element that is essential to the

nonmoving party's case and on which it will bear the burden of proof at trial.  See Cleveland v. Policy Mgmt. Sys. Corp., 526 U.S. 795, 805-06 (1999); Celotex, 477 U.S. at 322; Powell v. Nat'l Bd. of Med. Exam'rs, 364 F.3d 79, 84 (2d Cir. 2004).  In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986) (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)); see also Gallo, 22 F.3d at 1223.  Summary judgment is improper if there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party.  See Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 37 (2d Cir. 1994).  If the moving party meets its initial burden of showing a lack of a material issue of fact, the nonmoving party must produce evidence in the record and "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible."  Ying Jing Gan v. City of New York, 996 F.2d 522, 532 (2d Cir. 1993); see also Scotto v. Almenas, 143 F.3d 105, 114-15 (2d Cir. 1998).


**II.**

The following facts are undisputed unless otherwise noted:

Montalbano served as an officer with the PAPD from 1978 until 2010. (Def.'s R. 56.1 Stmt. ¶ 1; Pl.'s R. 56.1 Resp. ¶ 1.) He lives with his wife and their two children in New York City. (Def.'s R. 56.1 Stmt. ¶ 2; Pl.'s R. 56.1 Resp. ¶ 2.)

On March 9, 2009, while Montalbano was working as a Squad Leader for the PAPD's Emergency Services Unit ("ESU") at Building 254 in John F. Kennedy Airport, an incident occurred between Montalbano and Kohlmann, who was Montalbano's immediate supervisor. (Def.'s R. 56.1 Stmt. ¶¶ 7, 12; Pl.'s R. 56.1 Resp. ¶¶ 7, 12.) The next day, Kohlmann submitted a handwritten statement to Guarnieri, the commanding officer at JFK, alleging that Montalbano had made verbal threats to another officer, and had brandished a knife at the workplace. (Def.'s R. 56.1 Stmt. ¶¶ 11, 13; Pl.'s R. 56.1 Resp. ¶¶ 11, 13; Kromm Decl. Ex. I (Kohlmann Report).) The parties vigorously contest whether the incident actually took place as Kohlmann describes it. Kohlmann maintains that the incident took place as he describes it, and alleges that Montalbano regularly "bull[ied]" other officers. (Kromm Decl. Ex. D ("Kohlmann Dep."), at 13-24.) Montalbano claims that the incident did not occur and that Kohlmann is lying. (Kromm Decl. Ex. A ("Montalbano Dep."), at 65-70; Montalbano Aff. ¶ 3.) As a result of this incident, Montalbano was ordered to see Dr. Silver, a consultant psychologist employed by the Port Authority's Office of Medical Services.

4

(Def.'s R. 56.1 Stmt. ¶¶ 9, 14; Pl.'s R. 56.1 Resp. ¶¶ 9, 14.)
Montalbano thereafter returned to work at the same job, and was
transferred to a different building.  (Def.'s R. 56.1 Stmt. ¶
15; Pl.'s R. 56.1 Resp. ¶ 15.)

On August 12, 2009, New York City police officers were
called to Montalbano's home in response to an alleged domestic
incident involving Montalbano and his children.  (Def.'s R. 56.1
Stmt. ¶ 16; Pl.'s R. 56.1 Resp. ¶ 16.)  Montalbano's daughter
alleged that he punched her, and submitted a written complaint
to that effect to the police.  (Def.'s R. 56.1 Stmt. ¶ 16; Pl.'s
R. 56.1 Resp. ¶ 16; Kromm Decl. Exs. L (written police report),
M (typed police report).)  No arrest was made.  (Kromm Decl. Ex.
L.)  Montalbano asserts that he did not hit his daughter, and
that his daughter has since recanted her statement to the
police.  (See Montalbano Dep. 82-87.)  A separate domestic
incident involving Montalbano occurred four years earlier, on
May 17, 2005.  (Def.'s R. 56.1 Stmt. ¶ 6; Pl.'s R. 56.1 Resp. ¶
6; Kromm Decl. Ex. J.)  In that incident, police came to
Montalbano's home in response to reports that Montalbano had
locked his family out of the house and that Montalbano had
threatened the family with a gun.  (Def.'s R. 56.1 Stmt. ¶ 6;
Pl.'s R. 56.1 Resp. ¶ 6; Kromm Decl. Exs. J (written police
report), K (911 call audio).)  No arrest was made, and the
written statement made by Montalbano's wife only reflects that

Montalbano had allegedly locked his family out of the house.
(See Kromm Decl. Ex. J.)  Montalbano admits that he locked his
family out of the house, but denies that there was a gun
involved.  (See Montalbano Dep. 50-55.)

After the August 12, 2009 incident, Montalbano voluntarily
secured his two personal firearms at his workplace.  (Def.'s R.
56.1 Stmt. ¶ 17; Pl.'s R. 56.1 Resp. ¶ 17.)  Montalbano was then
sent for an evaluation by Dr. Francis, the senior psychologist
for OMS, because of the domestic incident.  (Def.'s R. 56.1
Stmt. ¶¶ 8, 18; Pl.'s R. 56.1 Resp. ¶¶ 8, 18; Montalbano Dep.
91.)  Dr. Francis found Montalbano fit for duty with the
restriction that he could carry his firearm on duty only.
(Def.'s R. 56.1 Stmt. ¶ 18; Pl.'s R. 56.1 Resp. ¶ 18; Compl. Ex
1 (disposition noting "firearm on duty only" restriction);
Montalbano Dep. 94-95.)  The parties dispute the basis for Dr.
Francis' restriction: the defendants suggest that Dr. Francis'
determination was based on her review of Montalbano's record and
the 911 call from the August 12 incident, while Montalbano
claims that Dr. Francis was abusive and that the restriction was
baseless. (Compare Montalbano Aff. ¶ 5 with Def.'s R. 56.1 Stmt.
¶ 18.)  Montalbano continued seeing Dr. Francis on a weekly
basis until October 22, 2009.  (Def.'s R. 56.1 Stmt. ¶ 21; Pl.'s
R. 56.1 Resp. ¶ 21.)  Thereafter, he began seeing Dr. Silver,
the consultant psychologist. (Def.'s R. 56.1 Stmt. ¶ 22; Pl.'s

R. 56.1 Resp. ¶ 22.)  On August 21, 2009, Montalbano also began seeing a private psychologist, Dr. Martin Weinberg, whom he had previously seen, and he saw Dr. Weinberg 12 times over the remainder of 2009.  (See Kromm Decl. Ex. H ("Weinberg Letter").)

On November 6, 2009, Dr. Silver requested that Dr. Weinberg opine on whether the gun restriction should be lifted.  (Def.'s R. 56.1 Stmt. ¶ 23; Pl.'s R. 56.1 Resp. ¶ 23.)  On January 8, 2010, Dr. Weinberg wrote a letter to Dr. Silver stating that Montalbano "remains behaviorally under control and despite his verbal complaints he does not present in a dangerous manner." (Weinberg Letter.)  Dr. Weinberg's letter discussed Montalbano's "interest in having gun restrictions rescinded" but did not specifically recommend that the on duty only restriction be lifted.  (Weinberg Letter.)  Dr. Silver testified at her deposition that she told Montalbano that, if Dr. Weinberg disagreed with her continued recommendation of the restriction, then he would be entitled to a third-party evaluation.  (Kromm Decl. Ex. B ("Silver Dep."), at 57-58.)

At no point was the on duty only restriction lifted.  On January 19, 2010, Montalbano retired from the PAPD.  (Def.'s R. 56.1 Stmt. ¶ 25; Pl.'s R. 56.1 Resp. ¶ 25.)

Montalbano never filed a grievance with the Port Authority Patrolmen's Benevolent Association, his union, in connection with the firearms restriction.  (Def.'s R. 56.1 Stmt. ¶ 24;

Pl.'s R. 56.1 Resp. ¶ 24; Montalbano Dep. at 97-98.)  Montalbano never filed an Article 78 proceeding in New York State Supreme Court challenging the on duty only restriction.  (Def.'s R. 56.1 Stmt. ¶ 27; Pl.'s R. 56.1 Resp. ¶ 27.)

After Montalabano retired in January 2010, he applied for a firearms permit.  (See Montalbano Aff ¶ 6.)  Montalbano claims, and the defendants do not dispute, that the City of New York, which issues such permits, would not accept his application without a Certificate of Good Standing from the Port Authority.[1] (Montalbano Aff. ¶¶ 5-6.)  Montalbano has not specified whether he has applied for a specific type of gun license.  In a February 16, 2010 letter to Montalbano's attorney, the Port Authority refused to conduct "further review of Mr. Montalbano's fitness"—in effect, to modify the firearms restriction which remains on his record with the Port Authority— because Montalbano was no longer a PAPD employee.  (Kromm Decl. Ex P.)

Montalbano filed this lawsuit in August 2010.  He alleges that the Port Authority and its two psychologists violated his constitutional rights under the Second and Fourteenth Amendment,

---

[1] There is little direct evidence in the record about what such a certificate is.  In his deposition testimony, Montalbano referred to this certificate as an "atta boy letter," and explained that such letters are normally given to retired PAPD officers as a matter of course.  (Montalbano Dep. at 127-134.) There is no other evidence in the record explaining what a Certificate of Good Standing or an "atta boy letter" is, or pursuant to what if any policy it is given.

as well as his rights to substantive and procedural due process under the Fourteenth Amendment, which rights he seeks to vindicate under 42 U.S.C. § 1983.  Montalbano also asserts state common law negligence claims against those defendants for their failure to assess his mental condition accurately, and state common law defamation claims against Guarnieri and Kohlmann for their accusations relating to the March 9, 2009 incident. Before the Court are the parties' cross-motions for summary judgment.


                              III.

     Montalbano argues that the defendants have violated his rights under the Second Amendment, and denied his right to substantive and procedural Due Process under the Fourteenth Amendment.  He seeks to vindicate those rights under 42 U.S.C. § 1983.  Section § 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

> 42 U.S.C. § 1983.

"To state a § 1983 claim, a plaintiff must establish that the defendant deprived him of a federal or constitutional right while acting under the color of state law." Cox v. Warwick Valley Cent. School Dist., 654 F.3d 267, 272 (2d Cir. 2011).

A.

Montalbano's first cause of action is asserted against the Port Authority for violation of his Second Amendment Rights.

The Port Authority cannot be held vicariously liable for the acts of its employees in a § 1983 action.  See, e.g., Caceres v. Port Authority of New York and New Jersey, 631 F.3d 620, 625 (2d Cir. 2011).  Rather, Montalbano must produce evidence showing that the alleged deprivation of his Second Amendment rights was the result of a policy, custom, or practice of the Port Authority itself.  See, e.g., Damato v. City of New York, No. 06 Civ. 3030, 2008 WL 2019122, at *3 (S.D.N.Y. May 12, 2008).  Montalbano's counsel conceded at oral argument that there was no evidence in the discovery record indicating that any other former Port Authority employee "was unduly given a firearms restriction." (Oral Arg. Tr. at 6-7.)  Moreover, while there is some deposition testimony by the plaintiff explaining the existence of "atta boy" letters that allegedly serve as unofficial certificates of good standing for retired PAPD officers applying for gun permits, (See Montalbano Dep. at 128-

10

134), there is no evidence in the record indicating that any
other former PAPD employee was denied such a letter.  Because
there is no evidence to support the existence of a policy,
custom, or practice of improperly restricting employees or
former employees' handgun use by the Port Authority, the first
cause of action must be dismissed.

Even if Montalbano were able to establish a policy, custom
or practice based on a "single-incident" theory of municipal
liability,[2] Montalbano has not shown that he has experienced a
deprivation of his Second Amendment Rights, and his claim must
fail on that basis as well.

The Second Amendment protects the right of a person to
possess a firearm in the home for self defense.  See District of
Columbia v. Heller, 554 U.S. 570, 635 (2008) (recognizing "the

---

[2] In certain specific circumstances, a single incident may
suffice to establish a municipal custom, policy, or practice
sufficient to create liability under § 1983; for example, a
single action taken directly by a municipal policymaker may be
sufficient to establish a municipal policy.  See, e.g., Amnesty
America v. Town of West Hartford, 361 F.3d 113, 127 (2d Cir.
2004) (Sotomayor, J.) ("[B]ecause a single action on a
policymaker's part is sufficient to create a municipal policy, a
single instance of deliberate indifference to subordinates'
actions can provide a basis for municipal liability.").
Alternatively, Montalbano might have argued that there was a
policy of providing "atta boy" letters as a basis to recieve gun
permits, but there is no evidence from which a reasonable jury
could find such a policy.  In any event, these arguments were
not pressed in this case, and in any event, as explained below,
there has been no deprivation of Montalbano's Second Amendment
rights.

right of law-abiding, responsible citizens to use arms in defense of hearth and home."); see also McDonald v. City of Chicago, 130 S. Ct. 3020, 3036 (2010).  The Second Amendment is "fully applicable to the States," as well as the federal government.  Id. at 3026.

However, "the right secured by the Second Amendment is not unlimited" and is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." Heller, 554 U.S. at 626.  The Supreme Court has therefore explained that its recent decisions in Heller and McDonald do not "cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms."  Id. at 626-627; see also McDonald, 130 S. Ct. at 3047 (plurality op.). Reasonable restrictions may be imposed on the right to keep and bear arms without the right being denied.  See id.; Nordyke v King, 644 F.3d 776, 786 (9th Cir. 2011) (analogizing to the First Amendment context and noting that "'the government may impose reasonable restrictions on the time, place, or manner of protected speech,' provided, inter alia, that the restrictions are not too cumbersome" (quoting Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989))), rehearing en banc granted, 2011 WL

5928130 (9th Cir. Nov 28, 2011); Mallard v. Potenza, 376 F. App'x. 132, 134 (2d Cir. 2010) (summary order) (Heller "did not hold reasonable licensing requirements unconstitutional.").

The Port Authority did not categorically bar Montalbano from keeping a firearm at home for self-defense.  Compare Heller, 554 U.S. at 636 ("[T]he enshrinement of constitutional rights necessarily takes . . . off the table. . . . the absolute prohibition of handguns held and used for self-defense in the home.").  Rather, the Port Authority limited Montalbano's possession of a firearm to on duty possession as a condition of his employment.  Cf. Jackler v. Byrne, 658 F.3d 225, 234 (2d Cir. 2011) ("It is by now well established . . . that a citizen, upon entering government service, 'by necessity must accept certain limitations on his or her freedom.'") (quoting Garcetti v. Ceballos, 547 U.S. 410, 418 (2006)).  It is uncontested that this restriction was put in place in the wake of a documented domestic incident in which police were sent (for the second time in five years) to Montalbano's home after his family members called 911.

The Port Authority's on duty restriction was a reasonable condition of Montalbano's continued employment. The possession of a firearm was a reasonable part of his employment with the PAPD.  At the same time, the PAPD could assure that the plaintiff only had access to the weapon while on duty.  Having

13

one of its police officers involved in an episode of domestic
gun violence, or allowing an officer to be armed and
unsupervised when the officer had a prior domestic incident,
would severely undermine the Port Authority's ability "to
operate efficiently and effectively" in providing security to
the public.  <u>Garcetti</u>, 547 U.S. at 419.  Moreover, Montalbano
did not object to the Port Authority's restriction at the time.

Montalbano argues now that his rights under the Second
Amendment have effectively been denied by the Port Authority's
refusal to give him a certificate of good standing now that he
has retired, because he cannot get a permit to carry a firearm
without such a certificate.[3]  This argument is meritless.
Nothing in the Second Amendment's "right to keep and bear arms"

---

[3] The papers and the evidence in the record do not explain
whether Montalbano would receive a permit if he had the
certificate of good standing, and Montalbano asserts only that
he cannot get a permit without such a certificate.  <u>See</u> NY PENAL
LAW § 400.00(4)(a) ("[T]he licensing officer shall either deny
the application for reasons specifically and concisely stated in
writing or grant the application and issue the license applied
for."); <u>see also</u> N.Y.C. Rules, tit. 38, § 5-10(c), (g), (n)
(listing grounds for denial of a handgun permit).  Moreover,
Montalbano does not explain whether he applied for a specific
type of permit or exemption which may have more stringent
requirements, <u>see, e.g.</u>, N.Y.C. Rules, tit. 38, § 5-04 (special
requirements for carry guard license), or how it is that he was
not already permitted by the City given that he had been
carrying a gun for over two decades.  Neither party has
identified the statutory basis for the requirement that
Montalbano procure a "certificate of good standing."
Nevertheless, the parties do not appear to dispute these points,
and they are therefore not at issue on this motion for summary
judgment.

requires that the Port Authority expunge from the records of its former employee a firearms restriction that was reasonably imposed after a documented domestic incident, in order to facilitate the former employee's gun ownership and use as a private citizen.[4]  Cf. Ysursa v. Pocatello Educ. Ass'n, 555 U.S. 353, 358 (2009) (noting, in the First Amendment context, that "[w]hile in some contexts the government must accommodate expression, it is not required to assist others in funding the expression of particular ideas, including political ones."). The Port Authority no longer employs Montalbano, and whatever duty it had to evaluate his ability to perform his job has now concluded.

To the extent that Montalbano alleges that the City of New York has, by requiring that he submit a certificate of good standing from the Port Authority in order to get a firearm permit, unreasonably restricted his Second Amendment rights, his complaint should have been directed at the City of New York. See, e.g., N.Y.C. Rules, tit. 38 § 5-07(e) (providing for the right of appeal when an application for a handgun permit is denied); see also, e.g., Kachalsky v. Cacace, --- F. Supp. 2d ---, 2011 WL 3962550, *30 (S.D.N.Y. Sept. 2, 2011) (granting

---

[4] This is doubly so where, as here, Montalbano acknowledges that he seeks the gun permit not so that he may defend his home, see Heller, 554 U.S. at 628-29, or oppose tyranny, see, e.g., McDonald, 130 S. Ct. 3107 n. 33 (Stevens, J., dissenting), but so that he may work as a private security guard.

summary judgment to New York State in challenge to state handgun licensing scheme under <u>Heller</u>).  Montalbano has not sued the City or challenged its permitting rules in this lawsuit. Because the Port Authority imposed a reasonable restriction on Montalbano's firearm use as a condition of his employment, and because the Port Authority is not now required by the Second Amendment expunge that restriction from Montalbano's record or pretend it was never imposed, Montalbano has not established a denial of his Second Amendment rights.

B.

Montalbano also alleges that he has been denied substantive due process under the Fourteenth Amendment.  "Substantive due process protects against government action that is arbitrary, conscience-shocking, or oppressive in a constitutional sense, but not against government action that is incorrect or ill advised." <u>Cunney v. Board of Trustees of Village of Grand View</u>, 660 F.3d 612, 626 (2d Cir. 2011) (quoting <u>Kaluczky v. City of White Plains</u>, 57 F.3d 202, 211 (2d Cir. 1995).  Substantive due process "is the right to be free of arbitrary government action that infringes a protected right." <u>O'Connor v. Pierson</u>, 426 F.3d 187, 200 n.6 (2d Cir. 2005) (emphasis in original). "Action that merely harms one's professional or business interests does not, alone, infringe a federally-protected right,

16

and thus does not implicate due process." Giammatteo v. Newton, --- F. App'x ----, 2011 WL 6157339, at *4 (2d Cir. Dec. 13, 2011) (summary order).

Because Montalbano cannot establish, for the reasons already explained, that his Second Amendment rights have been infringed, he cannot establish that he has been denied substantive due process on the basis of any alleged arbitrary action by the defendants. See Pierson, 426 F.3d at 200 n.6; see also Kaluczky, 57 F.3d at 211 ("[W]here a § 1983 plaintiff alleges a cause of action protected by an "explicit textual source" of the Constitution, "that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing" that claim.") (quoting Albright v. Oliver, 510 U.S. 266, 273 (1994)).

To the extent that Montalbano argues that he had a federally-protected right, independent of his Second Amendment claims, to a post-employment mental health re-evaluation by, or a certificate of good standing from, the Port Authority, this argument is without merit.  Montalbano cites no case to support the proposition that the right to a post-employment recommendation or evaluation from a government employer, in any context, is "deeply rooted in this Nation's history and tradition" or "implicit in the concept of ordered liberty." Washington v. Glucksberg, 521 U.S. 702, 721 (1997); cf. Trivedi

v. Thayer, No. 97 Civ. 1377, 1998 WL 799181, at *10 (S.D.N.Y.
November 16, 1998) (where a state employee plaintiff alleged
that falsified mental health evaluations by his employer had
caused his suspension from employment and the marring of his
employment record, the plaintiff "failed to offer evidence to
support a claim that he has been deprived of either a property
interest or a liberty interest protected by the Due Process
Clause"), aff'd 182 F.3d 901 (2d Cir. 1999) (table).

Nor in any event did the Port Authority act in a way that
was so arbitrary and capricious as to constitute illegitimate
governmental action.  See Natale v. Town of Ridgefield, 170 F.3d
258, 263 (2d Cir. 1999) ("Substantive due process is an outer
limit on the legitimacy of governmental action. It does not
forbid governmental actions that might fairly be deemed
arbitrary or capricious and for that reason correctable in a
state court lawsuit seeking review of administrative action.
Substantive due process standards are violated only by conduct
that is so outrageously arbitrary as to constitute a gross abuse
of governmental authority.").  It is not an abuse of government
authority to refuse to spend government resources performing a
mental health evaluation on a former employee who has
voluntarily retired, and who seeks the evaluation to aid in his
pursuit of private employment.  Nor is it an abuse of government
authority to refuse to issue a certificate of good standing to a

18

former employee for the former employee's use in obtaining a firearms permit when the employee retired from government with a firearms restriction on his record.

Because Montalbano can establish neither the existence of a protected right, nor constitutionally arbitrary and capricious action by the defendants in this case, he has not established a violation of Substantive Due Process under the Fourteenth Amendment.

C.

Montalbano also alleges that he has been denied procedural due process under the Fourteenth Amendment.  The procedural due process analysis proceeds in two steps: "(1) whether [the] plaintiff[] possessed a protected liberty or property interest, and, if so, (2) what process [the] plaintiff[] w[as] due before [he] could be deprived of that interest." Adams v. Suozzi, 517 F.3d 124, 127 (2d Cir. 2008) (internal quotation marks omitted); see also Swarthout v. Cooke, 131 S. Ct. 859, 861 (2011) ("We first ask whether there exists a liberty or property interest of which a person has been deprived, and if so we ask whether the procedures followed by the State were constitutionally sufficient.").

"Property interests . . . are created and their dimensions are defined by existing rules or understandings that stem from

an independent source such as state law-rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." Pierson, 426 F.3d at 196 (quoting Bd. of Regents of State Colleges v. Roth, 408 U.S. 564, 577 (1972)). The Supreme Court has recognized that "a benefit is not a protected entitlement if government officials may grant or deny it in their discretion." Town of Castle Rock v. Gonzales, 545 U.S. 748, 756 (2005).

Montalbano has adduced no evidence to indicate that the Port Authority has a legal or customary obligation to conduct an additional mental health evaluation on him as a former employee, or to change retroactively the restrictions that were placed on his firearm use, or to issue him a certificate of good standing. See, e.g., N.Y.C. Rules, tit. 38, §§ 5-04 (placing burden of employment-related handgun permit on the applicant and not the employer). Nor has Montalbano disputed that the Port Authority's decision to take or not to take these actions is discretionary. Montalbano therefore has not shown that he has a "legitimate claim of entitlement" to a certificate of good standing from the Port Authority. Roth, 408 U.S. at 577. He therefore has not established a violation of procedural due process in the defendants' refusal to issue such a certificate or to re-evaluate his mental health.

In any event, Montalbano challenges the underlying
determination by OMS that led to the firearms restriction.  The
reputational harm which stems from such determinations can
create a protected liberty interest which requires procedural
due process.  See, e.g., Wisconsin v. Constantineau, 400 U.S.
433, 437 (1971) ("Where a person's good name, reputation, honor,
or integrity is at stake because of what the government is doing
to him, notice and an opportunity to be heard are essential.");
see also Velez v. Levy, 401 F.3d 75, 87 (2d Cir. 2005).
Moreover, Montalbano argues that the underlying firearms
restriction deprived him of a liberty interest by preventing him
from keeping a gun in his home.  Cf. Kuck v. Danaher, 600 F.3d
159, 163 (2d Cir. 2010) (noting a liberty interest in the right
to carry a firearm created by the Connecticut State
Constitution).  Accepting for the moment the argument that
Montalbano was deprived of a liberty interest, the issue is
"whether the procedures followed" in restricting Montalbano's
firearms use "were constitutionally sufficient."  Swarthout, 131
S. Ct. at 861.

Whatever level of process was due in this case,[5] it was
available in the form of an Article 78 proceeding before the New

---

[5] "[D]ue process is flexible and calls for such procedural
protections as the particular situation demands."  Brody v.
Vill. of Port Chester, 434 F.3d 121, 134 (2d Cir. 2005).  The
three-factor test established in Mathews v. Eldridge, 424 U.S.

York State Supreme Court.  See NY CPLR § 7803.  It is settled law in this Circuit that "[a]n Article 78 proceeding provides the requisite post-deprivation process—even if [a plaintiff] failed to pursue it." Anemone v. Metropolitan Transp. Authority, 629 F.3d 97, 121 (2d Cir. 2011); see Segal v. City of New York, 459 F.3d 207, 218 (2d Cir. 2006).  Here, Montalbano could have challenged the gun restriction as an arbitrary and capricious determination pursuant to NY CPLR § 7803(3), which would have entitled him to a full hearing, and possibly a trial, before a New York State Supreme Court Justice with the power to annul the Port Authority's decision.  See N.Y. CPLR § 7806; see

---

319, 333 (1976) guides the analysis in determining what level of process is required in a given case, and whether a pre-deprivation hearing was due.  See Nnebe v. Daus, 644 F.3d 147, 158-59 (2d Cir. 2011) (analyzing the private interest, the risk of erroneous deprivation, and the government interest).

Here, Montalbano has not argued that he was entitled to a hearing before his gun use was restricted, and indeed he admits that he voluntarily turned in his weapons after the August 12, 2009 domestic incident.  Nor does he argue that he was deprived of physical property, which might weigh in favor of a pre-deprivation hearing.  See, e.g., Walters v. Wolf, 660 F.3d 307, 317-18 (8th Cir. 2011) (where handgun and ammunition were seized pursuant to arrest, and charges were later dismissed as unfounded, held that a predeprivation hearing was not required, but that the continued retention of the plaintiff's firearm without a hearing was a potential violation of procedural due process precluding summary judgment); but see Mallard, 376 F. App'x at 134 ("Mallard had no legitimate possessory interest in firearms for which he held no license.").  Accordingly, the issue is whether he received sufficient post-deprivation process.

generally Hellenic American Neighborhood Action Committee v. City of New York, 101 F.3d 877, 881 (2d Cir. 1996).  Montalbano chose not to avail himself of that process.

Montalbano's argument that 42 U.S.C. § 1983 does not require him to exhaust his remedies is misplaced.  The availability of an Article 78 proceeding does not mean that Montalbano was required to exhaust his administrative remedies.  Rather, the availability of an Article 78 proceeding ensures that Montalbano had adequate procedural due process to vindicate the alleged underlying right at the time that the deprivation occurred.  See id.  Because Montalbano could have availed himself of a constitutionally adequate process to vindicate his alleged rights, he has not established a violation of Procedural Due Process under the Fourteenth Amendment.

Montalbano has failed to establish a material issue of fact as to whether he has been deprived of a constitutional right under the Second or Fourteenth Amendments, in violation of 42 U.S.C. § 1983.  The defendants' motion for summary judgment is therefore granted with regard to Montalbano's federal claims.

IV.

Having dismissed the federal claims in this case, the Court declines to exercise supplemental jurisdiction over the plaintiffs' remaining state-law claims.  See 28 U.S.C. §

1367(c)(3).  The Court of Appeals for the Second Circuit has instructed that "in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims." Valencia ex rel. Franco v. Lee, 316 F.3d 299, 305 (2d Cir. 2003) (quoting Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 n. 7 (1988)); see also Vincent v. Money Store, No. 03 Civ. 2876, 2011 WL 4501325, at *5 (S.D.N.Y. September 29, 2011).

This case presents no basis for deviating from the balance articulated in Valencia.  While the Court of Appeals for the Second Circuit has upheld the exercise of supplemental jurisdiction over state-law claims when federal claims are dismissed on the eve of trial, this is not such a case.  See Valencia, 316 F.3d at 305-06 (citing Nowak v. Ironworkers Local 6 Pension Fund, 81 F.3d 1182, 1191-92 (2d Cir. 1996) (exercise of supplemental jurisdiction proper when federal claim dismissed just nine days before trial) and Raucci v. Town of Rotterdam, 902 F.2d 1050, 1055 (2d Cir. 1990) (supplemental jurisdiction proper when case was ready for trial at the time federal claims were dismissed)). Here, the case is not on the eve of trial, and dismissal of the remaining state law claims without prejudice is warranted.

## CONCLUSION

The Court has considered all of the arguments raised by the parties. To the extent not specifically addressed, the arguments are either moot or without merit.

The defendants' motion for summary judgment is **granted** as to the plaintiff's federal claims, and **denied** as to the plaintiff's state law claims. The plaintiff's motion for summary judgment is **denied.** The plaintiff's state law claims are **dismissed without prejudice**.

**The Clerk is directed to enter Judgment and to close this case. The Clerk is also directed to close all pending motions.**

**SO ORDERED.**

**Dated:     New York, New York**
**           February 16, 2012**

                              John G. Koeltl
                         United States District Judge

25